THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* DARRYL CARRADINE, Defendant-Appellant.

First District (5th Division)   No. 81—1131

Opinion filed April 8, 1983.

Joseph A. Ettinger and Rick M. Schoenfield, both of Ettinger & Schoenfield, Ltd., of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, David A. Shapiro, and James Klein, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial, defendant was convicted of attempted murder (Ill. Rev. Stat. 1979, ch. 38, pars. 8—4, 9—1), aggravated battery (Ill. Rev. Stat. 1979, ch. 38, par. 12—4) and armed violence (Ill. Rev. Stat. 1979, ch. 38, pars. 33A—2, 12—4(b)(1)) and sentenced to a six-year term for attempted murder, and a three-year-consecutive sentence for armed violence in the Illinois Department of Corrections.

Defendant appeals, alleging prejudicial error in (1) his impeachment as a witness by cross-examination regarding his prior arrests, (2) the trial court's misstatement of law concerning the credibility of a witness, and (3) the trial court's denial of a defense motion to reopen its case in chief to present a witness.

The following pertinent evidence was adduced at trial.

Steven Davis testified for the State that on the evening of September 5, 1980, he went to the Garage Disco on 66th Street and King Drive in Chicago, Illinois, and was dancing with Tyesha Martin when defendant bumped into him and walked in between them. An exchange of words followed, and when Martin asked the two men to "cool all this out," Davis walked away. Subsequently, defendant approached Davis in the washroom and stated that he had a "violation" against him which Davis stated was a street term meaning "that I had something coming to me."

Davis further testified that he had seen and talked to his girlfriend, Kumar Spencer, in the disco, and decided to leave with her at about 1:25 a.m. As he left the building, he encountered defendant who again said that he had a "violation" against him, and, as they started to argue, a security guard for the disco told them to move across the street. They proceeded to cross the street onto a small embankment in a parking lot where a fist fight ensued. Defendant pulled a pearly white object out of his pocket, swung at him, and ran across the street where he was grabbed by the security guards. Davis noticed his jacket had been ripped and then saw his intestines were

hanging out of his abdomen. He screamed, "I've been cut, I'm stabbed," and he went back across the street to the disco seeking help. He was taken to the emergency room of Billings Hospital where he underwent surgery, remained hospitalized for four days, and subsequently received treatment for approximately a month following his injury.

Tyesha Martin testified for the defense that she went to the disco that evening with defendant's sister, Rene Carradine, and danced with both defendant and Davis. As she first danced with defendant, Davis interrupted and asked her where defendant's sister was. After she responded, defendant told Davis that it was not polite to interrupt their dance. Davis retorted that he was not talking to him but to the young lady, and left. Later on in the evening, defendant came up behind Davis as he was dancing with her, and briefly argued with him until Martin asked them to stop and Davis walked away.

Defendant testified on his own behalf that he went to the disco with Charles and Daniel Hilson, and as was customary, they were searched by security guards before being allowed to enter the building. The search was a full pat down body search and the guards found nothing on them. Once inside, he argued with Davis when he interrupted his dance with Tyesha Martin, but denied that any argument between them occurred in the bathroom.

He further testified that subsequent to his dance with Martin, various young men approached him several times to ask him what gang he was in, and when he told them he was not in a gang they indicated by gesture that they were with the Disciples street gang.

Defendant explained that he decided to leave after being approached by the Disciples, and walked outside the disco with Charles Hilson to wait for his sister who was to join them on their return home. While Hilson and several other young men gathered around them, Davis came outside the disco and defendant began to argue with him. Both men accused each other of having a "violation" and they crossed the street to continue the argument with most of the other 15 to 20 young men following them.

Defendant further testified that he pushed Davis down and ran from the group that was on the hill back to the disco to seek protection from Davis and the crowd, and that he did not stab Davis.

On direct examination, defendant testified that he spoke with a State's Attorney at the police station who asked him, *inter alia*, what his address was "and have I ever been locked up before. I said no."

On re-cross-examination the following colloquy ensued:

"STATE'S ATTORNEY: Mr. Carradine, you say when you

talked to the State's Attorney you tried to answer his questions truthfully, didn't you?

DEFENDANT: I did answer them truthfully.

STATE'S ATTORNEY: And you say one of the things he asked you was if you were ever locked up before, right?

DEFENDANT: Yes.

STATE'S ATTORNEY: And you told him no. Is that what you told the State's Attorney as to whether you had been locked up before? Did you tell him no, Mr. Davis? Mr. Carradine?

DEFENDANT: I think so.

STATE'S ATTORNEY: But that's not true, is it? Mr. Carradine?

DEFENDANT: No.

STATE'S ATTORNEY: As a matter of fact, Mr. Carradine, you have been locked up more than once before, haven't you?
* * *
[Y]ou got locked up on the 23d of January for battery, didn't you? You remember that, don't you?

DEFENDANT: Yes.

STATE'S ATTORNEY: And you remember on the 10th of July, 1980, when they locked you up for burglary. Do you remember that one?

DEFENDANT: Burglary?

STATE'S ATTORNEY: Yes.

DEFENDANT: Yes.

STATE'S ATTORNEY: Do you remember the 18th of July, '80 just eight days after that one when they locked you up for rape?

DEFENDANT: Yes.

STATE'S ATTORNEY: But those things slipped your mind when you talked to the State's Attorney when you were truthful with them? You just forgot about it, right.

DEFENDANT: No, I didn't forget about it."

The defense attorney attempted to rehabilitate the defendant by questioning him regarding his prior arrests but the trial court refused to allow testimony concerning any prior arrests, trials, or convictions, although defendant had not been tried or convicted for the prior arrests.

During this time the trial court made the following statement in the presence of the jury: "For the fourth time, the question was, was he ever locked up, it's not for the jury to determine the credibility of this witness, not the charges on what he was charged with [sic]."

The defense moved to re-open its case in chief after the State rested because it had found a new witness. The trial court denied this defense motion.

During the State's closing argument, the prosecution referred to the defendant's comment about having been "locked up." "Now, [the public defender] said, you can look in that man's face and see that he is telling the truth; but aside from looking in his face remember the answer that he gave about what he told the State's Attorney—it was a State's Attorney in the police station that apparently asked him have you ever been locked up before—that he volunteered when his attorney was questioning him. Now I said, you're honest with everything that you told the State's Attorney? He said, yes, I was. I said, were you honest with the State's Attorney when you told him you haven't been locked up before? He said, yes. Did you tell the State's Attorney about being locked up for battery? No. That wasn't honest, was it? No. Did you tell the State's Attorney about being locked up for burglary? No. That wasn't honest, was it? No. And did you forget also to tell the State's Attorney when you were locked up for rape? Yes, I forgot that, too. He told you on the stand he wasn't honest with the State's Attorney and I will tell you right now he has not been honest with you."

The jury subsequently found defendant guilty of attempted murder, aggravated battery, and armed violence. Following a hearing, the trial court sentenced defendant to six years for attempted murder and three years for armed violence to run concurrently. The aggravated battery counts merged into the attempted murder charge for sentencing.

OPINION

Defendant first argues that prejudicial error occurred in his impeachment as a witness by cross-examination regarding his prior arrests. Although the State contends that defendant has waived any claim of error by failing to object at trial, we find that we have ample

authority under Supreme Court Rule 615(a) (73 Ill. 2d R. 615(a)) to consider substantial rights even though not properly preserved at trial.

Generally, evidence that a defendant has committed an offense which is separate and distinct from the offense for which he is being tried is not admissible because of its prejudicial effect (*People v. Turner* (1979), 78 Ill. App. 3d 82, 396 N.E.2d 1139) as no question is more damaging to a defendant with a jury than one that suggests or intimates that he is a criminal or has been charged with criminal offenses. (*People v. Harges* (1967), 87 Ill. App. 2d 376, 231 N.E.2d 650.) Thus, proof of a prior conviction is inadmissible unless relevant to show motive, intent, identity, absence of mistake or *modus operandi* (*People v. Walls* (1980), 87 Ill. App. 3d 256, 408 N.E.2d 1056) and the trial court must balance its relevance against its tendency to inflame and prejudice the jury. *People v. Olson* (1981), 96 Ill. App. 3d 193, 420 N.E.2d 1161.

In *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695, our supreme court established further guidelines to the general rule and held that only convictions of crimes punishable by sentences of more than one year, or involving dishonesty or false statement may be admitted, and only if the conviction or release of the testifying witness, whichever occurred later, was less than 10 years prior to the testimony. *People v. Montgomery* (1971), 47 Ill. 2d 510, 516, 268 N.E.2d 695, 698-99.

The rules relating to impeachment of witnesses are the same where it is the accused who testifies (*People v. Gilmore* (1969), 118 Ill. App. 2d 100, 254 N.E.2d 590, *cert. denied* (1970), 400 U.S. 845, 27 L. Ed. 2d 81, 91 S. Ct. 89), although, of course, the danger of unfair prejudice increases where the conviction relates more closely to the accused (*People v. Brown* (1978), 61 Ill. App. 3d 180, 377 N.E.2d 1201) due to the possibility that the jury will convict a defendant because it appears that he is of bad character and therefore probably committed the crime, rather than because of the evidence of his guilt or innocence in the case on trial. *People v. Hall* (1982), 104 Ill. App. 3d 1064, 433 N.E.2d 1039.

However, it is also clear that a prosecutor may cross-examine regarding any other convictions when a witness himself has "opened the door" by testifying on direct examination regarding some aspect of his criminal record (*People v. Brown* (1978), 61 Ill. App. 3d 180, 377 N.E.2d 1201), and, where a witness affirmatively states that he has never been arrested, there is some authority to indicate that the prosecutor may then cross-examine regarding any prior arrests. *Peo-*

*ple v. Johnson* (1976), 42 Ill. App. 3d 194, 198, 355 N.E.2d 577, 579.

In the present case, however, defendant's sole reference to his past criminal record was that a State's Attorney asked him at the police station if he had ever been "locked up" before and he responded "no." Even assuming, arguendo, that proper cross-examination followed, the use of the phrase "locked up" during both cross-examination and closing argument connotes a conviction, which might serve to alter the jury's perception of the defendant and which is ambiguous at best.

Thus, we find that use of the ambiguous phrase "locked up" for impeachment purposes, coupled with the trial court's failure to allow defendant to explain the circumstances of the arrests and their dispositions, or to give a limiting instruction to the jury regarding the limited relevance of such evidence, far outweighed the probative value of such evidence. (See also *People v. Hudson* (1972), 7 Ill. App. 3d 333, 287 N.E.2d 297.) As a result, defendant was denied the right to choose to explain the circumstances and disposition of the arrests to the jury in order to remedy the danger of prejudice. Accordingly, we hold that the trial court's refusal to permit the defense to present such evidence was plain error.

As to the other alleged errors concerning the trial court's misstatement of law, and the denial of the defense motion to re-open its case to present a witness, we note that these issues are not likely to occur again at retrial and we do not consider them here.

For the foregoing reasons, the judgment of the trial court is reversed and the cause remanded for a new trial.

Reversed and remanded.

SULLIVAN and MEJDA, JJ., concur.