THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTHONY BUNCH et al., Defendants-Appellants.

First District (2nd Division)   Nos. 85—2048, 85—2176 cons.

Opinion filed August 4, 1987.

James J. Doherty, Public Defender, and Steven Clark and Debra R. Salinger, both of State Appellate Defender's Office, both of Chicago (Kendall Hill, Assistant Public Defender, of counsel), for appellants.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., Bonnie Meyer Sloan, and Anita M. Alvarez, Assistant State's Attorneys, of counsel), for the People.

JUSTICE STAMOS delivered the opinion of the court:

Defendants Anthony Bunch and Derrick Batson were convicted of murder after a jury trial and were sentenced to a term of 35 years' imprisonment to be followed by three years' mandatory supervised release. Defendants now appeal from their convictions, raising numerous issues.

The record discloses that on August 26, 1984, the victim, Joey Szafraniec, was shot and killed by defendant Batson as he fled from Batson, defendant Bunch and three other assailants.

Madeline Cortez testified that on August 26, 1984, at approxi-

mately 6:20 p.m., she was walking down North Avenue on the west side of Chicago accompanied by her sister, Evelyn, and a youth named Felix, when she witnessed a fight. Approximately five black youths, including both defendants, were beating a white youth. Bunch, also known as Bobo, left the fight momentarily and walked toward a nearby liquor store. As he arrived at the store, Bunch reached into his waistband and pulled out a handgun. Batson, also known as Shooter, also left the fight and followed Bunch on his bicycle. Bunch gave the gun to Batson and the two youths returned to the fight.

The victim broke free momentarily and began to flee down the street toward an alley when Batson raised the gun in front of him and fired twice at the victim. Batson's hands moved upward and backward as he fired. The victim fell to the ground and both defendants fled. Madeline approached the victim and observed that he had a hole in his head and was covered with blood. Madeline went home and later spoke with a police officer, Tom Shouse, when he arrived at her home. Her sister Evelyn was present when Madeline spoke with Shouse. Madeline identified both defendants in a police photograph book and at a police lineup later that evening. Madeline also identified another of the victim's assailants in a second lineup. The police photograph book containing defendants' photographs among others was admitted into evidence.

On cross-examination, Madeline testified that both defendants struck the victim during the fight. The victim hit no one and tried to protect his face. Madeline could not state the ages, height or weight of defendants or the victim. Immediately prior to the shooting, the victim and one of his assailants called out the names of the Latin King and Imperial Gangster street gangs. Madeline maintained that she told several unknown police detectives that she had seen Batson before and that she saw him ride his bike toward the victim while carrying a gun. Madeline stated she viewed both lineups alone and was not told by anyone that defendants were present in either lineup. Madeline denied that she had discussed her testimony with the assistant State's Attorney or his partner or had seen their visual aid, a plat of the scene of the shooting, prior to trial. Madeline also denied that she had ever discussed the shooting incident with her sister. Madeline spoke only on one occasion with the assistant State's Attorneys at which time they told her to tell the truth.

Sergeant Frederick Robertson of the Chicago police department testified that at 6:20 p.m. on the evening of August 26, 1984, he responded to a call of a man shot. Arriving at the scene, Sergeant Robertson observed the victim's body lying in an alley. Robertson

gathered a description of the offenders from bystanders and put out a flash message over the police radio. He did not speak with Madeline or Evelyn Cortez. Robertson then went with several officers to a location at which he believed one of the offenders might be. As Robertson proceeded by car down the street, he observed Bunch, who matched the offender's description, and stopped to question him. Bunch was in possession of a bicycle. Robertson placed Bunch under arrest.

Officer Thomas Shouse testified that he was a friend of the Cortez family. Shouse monitored the radio call of a man shot and arrived at the scene to conduct a follow-up investigation. He spoke with the Cortez sisters then transported them to the police station.

Evelyn Cortez testified that on August 26, 1984, she was walking home from a carnival with her sister Madeline when they witnessed a fight. The victim was backed up against a gate and was being struck by Bunch and four other youths. Bunch left the fight and walked around the corner where he was followed by Batson. Bunch removed a gun from his waistband and gave it to Batson and both youths returned to the fight. The victim began to walk toward an alley when Batson raised the gun and fired two shots at him. The victim fell to the ground in the alley. Batson walked up to the victim then gave his bicycle to Bunch. Both defendants then left the scene.

Evelyn and Madeline went home and were visited later that evening by Officer Shouse. Shouse escorted Evelyn and Madeline to the police station where they were asked to look through a book of photographs. Evelyn identified both defendants. She was alone at the time and was not told by the police whom to pick out. Evelyn then witnessed two lineups. From the first lineup, she identified an individual named Victor Guzman and from the second lineup, she identified both defendants as the victim's assailants. She was not told by police that defendants were in the lineup and she did not discuss the lineup with her sister Madeline. Evelyn stated that she knew defendants prior to the shooting because they were around her house with several other youths.

On cross-examination, Evelyn maintained that she never spoke to her sister Madeline about the shooting. Evelyn denied that she had a brother or stepbrother. Evelyn denied knowing a man named "Popo" and stated that she never lived with any family, brother, stepbrother, cousin or friend of such name. Evelyn admitted that Batson was wearing a hooded shirt at the time of the shooting and she could see only his face.

A sidebar was then called by Bunch's counsel, Mr. Miller. Miller told the court that the assistant State's Attorney, Mr. Rueckert, had

informed him that Evelyn did in fact have a brother or family friend who was moved by the State to Puerto Rico. Miller added that this story was corroborated by a defense witness, Miriam Mendez. Miller suggested that Rueckert was a witness, consequently, and asked that Rueckert withdraw from the case. Miller also sought to call Rueckert to refute Madeline's testimony that she had never spoken with Rueckert prior to trial. Rueckert told the court that an airline ticket to Puerto Rico had been purchased for an individual who lived with the family at the request of Madeline's mother. Rueckert stated that the individual had been threatened by the Latin Kings street gang. He did not know of any relationship between Evelyn, Madeline and this individual.

The court thereafter denied Miller's motions for a mistrial, a continuance and to call Rueckert as a witness. The court stated that it would allow Miller to question Evelyn further in regards to whether she had a brother, but would not allow the defense attorney to question Evelyn beyond this matter. Evelyn was called to the court's chambers where she identified the individual as Anderson Cortez, her brother. Anderson was approximately 20 years old and was also called "Nelson" and "Popo." Evelyn stated that she had misunderstood Miller's question earlier. Evelyn was recalled to the stand where she testified that she had a brother but he no longer lived with her.

Detective Richard Schak testified that two street gangs, the Disciples and the Latin Kings, operate within the area where the instant shooting occurred. On the evening of August 26, Schak spoke with the Cortez sisters. They were separately asked to view a photograph book and to identify any of the victim's assailants. Both Evelyn and Madeline identified both defendants. Thereafter, Schak assisted in the apprehension of Batson. Batson and Bunch were placed in a police lineup and were separately identified by Madeline and Evelyn.

Dr. Yuksel Konacki, a physician employed by the Chicago medical examiner's office, testified regarding his postmortem examination of the victim. Dr. Konacki observed a bullet wound at the rear of the victim's head and various abrasions of the head and face. Dr. Konacki opined that the victim had died as a result of the gunshot wound.

Detective Michael Herigodt testified that on August 26 he spoke with Bunch at police headquarters. Bunch told Herigodt that he was with Miriam Mendez at the time of the incident and was a member of the Latin Kings street gang. Bunch also told Herigodt that a fellow gang member named "Lefty" had been beaten earlier that day by a group of Disciples. Bunch then went looking for the Disciples. Herigodt thereafter spoke with Bunch in the presence of an assistant

State's Attorney. Bunch told them that he was at a carnival at the time of the shooting. When he heard the shots, Bunch rode by the scene on his bicycle. On cross-examination, Herigodt stated that Bunch denied any involvement with the shooting. A written statement was prepared by the assistant State's Attorney, but Bunch refused to sign it.

Assistant State's Attorney John O'Donnell testified that he spoke with both defendants on August 27 regarding the shooting. Batson gave a written statement in the presence of O'Donnell in which he stated that his friend Lefty was beaten by a group of "D's" (Disciples) with a baseball bat. Batson admitted that he was present when the victim was shot. Batson also stated that while he saw who shot the victim, and had handled the gun, he was not a "trick."

Louis Maldonado testified on behalf of defendant Batson. Maldonado stated that he was nicknamed Lefty and was a member of the Latin Kings street gang and a friend of defendants, also Latin King members. Maldonado was acquainted with the victim, who belonged to a street gang called the Imperial Gangsters. The Imperial Gangsters were friends with a third gang, the Disciples, while the Latin Kings were enemies of the Disciples. On the day of the shooting, Maldonado met Batson outside a restaurant and bicycled with him to a schoolyard where they met Bunch, Bunch's girlfriend Miriam and several other friends. As the group began to walk to a carnival nearby, several groups of guys began to chase Batson and chant "There goes Doodee." Maldonado tried to turn his bicycle around but was chased by a group of four youths wielding a baseball bat and was struck. Maldonado saw several other youths chase Batson and grab him. Maldonado could not remember if the victim was in the group. Maldonado lost sight of Batson thereafter and returned to the school where he heard that a fight was going to occur. Maldonado did not observe the fight or the shooting. Maldonado saw Batson at approximately 6 p.m. but did not speak to him. Maldonado went to a restaurant with three friends and remained there until 7 p.m.

On cross-examination, Maldonado testified that he never went to a hospital or to the police after he was struck with the baseball bat. Maldonado first heard of the shooting and of the fact that Batson had been arrested the following day. Maldonado never went to the police and told them that Batson had not been involved with the shooting.

Miriam Mendez, Bunch's girlfriend, testified that she had known Bunch for approximately 1½ years. On the evening of the shooting, at 6:15 p.m., Miriam met Bunch at a grocery store near her home. The two were seated on the stairs and were talking when they heard

gunshots. Bunch stayed with Miriam for approximately 45 minutes, then he rode off on Miriam's bicycle. As Bunch rode away, Miriam saw the police stop and apprehend him. Miriam stated that she was acquainted with the Cortez sisters because she had dated their brother.

On cross-examination, Miriam admitted that she told a police officer that she was with Bunch when Maldonado told him he had been beaten up. She denied telling the same officer that everyone, including Bunch, then left her on the street alone and that Bunch returned to her only after she heard the shots. She also denied telling the police that when Bunch returned, he asked for her bicycle and rode away. Miriam was not aware of whether or not Bunch was carrying a gun that evening.

Bunch testified that he was with his girlfriend Miriam on the evening of August 26 when they heard shots fired. As he left on her bicycle, he was apprehended by the police. Bunch was questioned from 6:30 p.m. that evening until approximately 5 or 6 a.m. and was handcuffed and beaten by police when he refused to sign a written statement. Bunch was asked whether he was ever arrested as a juvenile; he admitted he had been arrested at age 16 for auto theft. He denied any connection with the shooting of the victim and stated he did not give a gun to Batson and did not have a gun in his possession that day. Bunch stated that he refused to sign the statement because he did not understand it.

On cross-examination, Bunch admitted that he was a Latin King street gang member. Bunch denied telling John O'Donnell that his friend Lefty had been jumped by Disciples that previous evening and beaten with a baseball bat. Bunch also denied telling the police that he rode by the scene of the shooting and saw the victim. Bunch did not tell the police that he had been with Miriam at the time of the shooting. Bunch stated he did not know the victim. Bunch was asked whether he had been photographed by the police before and admitted that he had been photographed.

In rebuttal, Detective Schak testified that he spoke separately with Bunch and Miriam following the shooting on August 26. Schak stated that Miriam told him that Bunch left with Lefty after Lefty told him that he had been beaten. A short time later, Miriam heard gunshots and Bunch returned. Miriam told Schak she was not aware of whether or not Bunch had a gun. Schak and Herigodt spoke with Bunch later that evening. Bunch told the detectives that he left Miriam to help Lefty look for the individuals who had beaten him earlier that day. He heard gunshots and arrived at the scene, where he ob-

served the victim lying in an alley. On cross-examination, Schak stated that Bunch never admitted he was involved with the shooting.

Assistant State's Attorney Rueckert then read to the jury a certified copy of two prior adjudications of Bunch's delinquency as a juvenile for the crimes of theft and possession of a stolen motor vehicle.

Richard Diorka, the victim's cousin, identified the victim from a photograph of five people. Diorka testified that the photograph accurately depicted the victim's identity and physical condition prior to the shooting. Diorka also identified the victim as depicted by police photographs after the shooting.

Prior to *voir dire*, defense counsel asked the court to question the veniremen regarding whether they could presume defendant to be innocent of the charges against him and give him a fair trial even though he was a member of a street gang and in spite of the fact that they were black and the victim was white. The court granted defense counsel's request with respect to the matter of defendant's street gang affiliation, but denied counsel's request to question prospective jurors regarding their prejudices toward the black defendants. In lieu, the court stated that it would ask the standard question concerning whether the jurors would permit prejudice to affect his or her judgment in reaching a verdict.

During closing argument, the assistant State's Attorney argued that "All surrounding circumstances proved that the Cortez sisters are telling the truth. *** Everybody else describes the scene in the same way as they do, they are reliable as to that." Later Rueckert stated that defendant's contention that he was framed was meritless because "If we are going to make something up and if we are going to get a state's attorney up here to put his law license on the line we are sure as heck going to make sure this says he did it." Rueckert also commented "I wish Joey Szafraniec could walk out of this courtroom and go home with his mother also. This is not going to happen though." Rueckert further commented on defendants' allegations that the police officers who testified were lying: "They [defendants] are saying they are lying they are flat out lying. They tell you they got a reason to lie, but has either one of those two gentlemen stepped up here and given you that reason ***?" Defense counsel's objection to this remark was sustained by the court and the jury was instructed to disregard it.

At the close of arguments, the jury found both defendants guilt of murder. The court considered evidence that Batson had no prior convictions, no drug or alcohol problems, and a strong family environment. The court also considered evidence that Bunch had been con-

victed of auto theft, robbery, residential burglary as a juvenile and had been arrested three times for possession of marijuana. The court remarked "it is difficult for a judge to have to sentence young people to long, long prison terms, but it has to be done. It has to be done in order to keep the integrity of our society." Defendants were thereafter both sentenced to 35 years' imprisonment.

The first contention on appeal, raised by defendant Bunch, is that improper restrictions on his ability to cross-examine the State's eyewitness Evelyn Cortez regarding her potential motive to give false testimony violated his sixth amendment right to confrontation and his right to a fair trial.

As defendant Bunch correctly maintains, he has a constitutional right to confront the witnesses who testify against him. (U.S. Const., amend. VI.) This right has been made obligatory on the States through the fourteenth amendment and includes the right to cross-examine a witness as to the witness' biases, interests or motives to testify falsely. (*People v. Triplett* (1985), 108 Ill. 2d 463, 485 N.E.2d 9.) Although the trial court has no discretionary power to deny the defendant this right, the court does have broad discretion to preclude repetitive or unduly harassing questioning on these matters. *People v. Triplett* (1985), 108 Ill. 2d 463, 485 N.E.2d 9; *People v. Phillips* (1981), 95 Ill. App. 3d 1013, 420 N.E.2d 837.

Furthermore, when impeaching by showing bias, interest or motive, the evidence must give rise to the inference that the witness has something to gain or lose by his or her testimony and, therefore, the evidence used must not be remote or uncertain. *People v. Merz* (1984), 122 Ill. App. 3d 972, 461 N.E.2d 1380; *People v. Phillips* (1981), 95 Ill. App. 3d 1013, 420 N.E.2d 837.

Here, during cross-examination, Evelyn Cortez initially responded that she did not have a brother and did not know about whom defense counsel was talking when he referred to an individual named "Popo." After a sidebar conference, during which the assistant State's Attorney informed the court that an airline ticket to Puerto Rico had been purchased by the State for the use of an individual named Anderson Cortez, Evelyn was called into the judge's chambers, where she admitted that she had a brother named Anderson Cortez who was 20 years old. Evelyn stated she had misunderstood defense counsel's question during his cross-examination of her at trial earlier. The court then ruled that Evelyn could be recalled to the stand where defense counsel could only repose the question regarding whether Evelyn had a brother. The court ruled that no further inquiry would be permitted.

Bunch's contention that Evelyn had a motive to testify falsely

because the State had purchased an airline ticket for her brother is unfounded. Evelyn's name appeared as a witness in the State's answer to discovery which was filed in November 1984, approximately seven months prior to trial. Moreover, Evelyn and Madeline were eyewitnesses to the shooting and spoke with the police on the night of the shooting when they identified both defendants from police photograph books and in police lineups. Thus, Evelyn's willingness to testify against defendants was secured long before the State purchased an airline ticket to Puerto Rico for Anderson Cortez four days prior to trial. Defense counsel was given wide latitude to cross-examine Evelyn as to any motives she had to testify falsely. She admitted that she knew both defendants prior to the shooting and that the police officer to whom she first spoke about the crime, Tom Shouse, was a friend of her family. Hence, we find that the court's limitation on defense counsel's cross-examination of Evelyn regarding this matter was not improper.

■■ ■ The second contention on appeal, raised by both defendants, is that they were deprived of due process of law under the fifth and fourteenth amendments of the constitution, where the State failed to disclose to him exculpatory evidence which would impeach their key witnesses, Evelyn and Madeline Cortez. Specifically, defendants argue that their constitutional rights were violated when the State purchased an airline ticket to Puerto Rico for Evelyn and Madeline's brother, Anderson, and failed to disclose this information to defense counsel.

As the United States Supreme Court held in *United States v. Bagley* (1985), 473 U.S. 667, 87 L. Ed. 2d 481, 105 S. Ct. 3375, evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. (*United States v. Bagley* (1985), 473 U.S. 667, 87 L. Ed. 2d 481, 105 S. Ct. 3375.) Suppression of evidence amounts to a constitutional violation only if it deprives the defendant of a fair trial, and a constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial. (*United States v. Bagley* (1985), 473 U.S. 667, 87 L. Ed. 2d 481, 105 S. Ct. 3375.) The nondisclosed evidence must be evaluated in the context of the entire record to determine if it creates a reasonable doubt that did not otherwise exist. *United States v. Agurs* (1976), 427 U.S. 97, 49 L. Ed. 2d 342, 96 S. Ct. 2392; see also *People v. King* (1985), 140 Ill. App. 3d 937, 486 N.E.2d 978.

██ Here, on the second day of trial, Assistant State's Attorney Rueckert told the court in conference that the State had purchased an airline ticket to Puerto Rico, at the request of Mrs. Cortez, four days prior to trial for an individual who lived with the family. Rueckert explained that this was done because threats had been made against this individual by a street gang. Rueckert did not know of any relationship between the individual and the Cortez sisters. Evelyn later identified this individual as her brother, Anderson, in the court's chambers.

Defendants fail to show how the jury's verdict may have been undermined by the State's late disclosure. Even if, as defendants assert, the Cortez sisters had been motivated to testify falsely at trial, this contention overlooks the fact that Evelyn and Madeline identified both defendants on the night of the shooting as the victim's assailants. There is likewise no indication that the disclosure of this evidence possessed the degree of materiality necessary to make a difference in the outcome of the trial. Moreover, defense counsel attacked the credibility of Evelyn on cross-examination and in closing argument where he stated that Evelyn had lied about having a brother and may have thus fabricated other parts of her testimony. Evidence of the purchase of an airline ticket for Evelyn and Madeline's brother would have been merely cumulative and the absence of such evidence would not have affected the outcome of the trial.

The cases cited by defendants as in support of their argument here are not persuasive. In *People v. Cagle* (1969), 41 Ill. 2d 528, 244 N.E.2d 200, the trial court denied defendant's request to impeach, with a police report, one of the State's witnesses, an alleged accomplice of the defendant's who had admitted his participation in the incident. Here, it is not alleged that the Cortez sisters were accomplices of defendants. In *People v. McCabe* (1979), 75 Ill. App. 3d 162, 393 N.E.2d 1199, and in *People v. Lott* (1977), 66 Ill. 2d 290, 362 N.E.2d 312, the State did not disclose material evidence, a composite drawing used to identify defendant and evidence that defendant had admitted to a fellow inmate that he committed the crime, respectively, until trial was underway. Here, we find that the information revealed here regarding the purchase of an airline ticket for Anderson Cortez was not of such materiality. Thus, we reject defendants' contention that they were denied a fair trial by the State's failure to disclose this evidence.

██ The third contention on appeal, raised by defendant Bunch, is that he did not receive a fair trial where the State allegedly failed to correct false testimony given by its witness Madeline Cortez. Specifically, defendant Bunch claims that Madeline's assertion that she did

not discuss her testimony with the assistant State's Attorney prior to trial was false and should have been corrected by the State at trial. It is clear that a prosecutor's use of testimony known to be false is a practice so lacking in fundamental fairness as to deprive an accused of due process of law. *People v. Martin* (1974), 56 Ill. 2d 322, 307 N.E.2d 388.

Upon consideration of this contention, we find that defendant has failed to present evidence which would establish that Madeline Cortez answered falsely when asked if she had spoken with the assistant State's Attorney prior to trial. In *Napue v. Illinois* (1959), 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173, the United States Supreme Court held that the failure of the prosecutor to correct the testimony of a witness which was known to be false constituted a denial of due process of law. However, the false testimony must be established in the record. *Napue v. Illinois* (1959), 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173; *People v. Swimley* (1978), 57 Ill. App. 3d 116, 372 N.E.2d 887.

Here, Madeline Cortez testified on cross-examination that she had never discussed her testimony with the assistant State's Attorney and had never been shown their visual aid, a plat of the scene of the shooting, prior to the day of trial. Madeline then stated that she had spoken only on one occasion with the assistant State's Attorneys at which time they had admonished her to tell the truth when she testified at trial. Madeline began to testify that she had spoken to an assistant State's Attorney at the police station on one occasion, but was interrupted by defense counsel. Later, at a conference in the court's chambers, an assistant State's Attorney told the court that he had spoken to Madeline in the police station approximately four weeks after the shooting and on the day she testified.

Thus, Madeline's answers were not untruthful. Madeline began to explain that she had spoken with the assistant State's Attorney in the police station, but defense counsel did not make any effort to specify any given date or further clarify his question. Defense counsel's question regarding whether Madeline had spoken with the assistant State's Attorney prior to the day of trial was also answered correctly as Madeline had spoken with a State's Attorney on the day of trial itself. The record is devoid of evidence which would indicate that Madeline Cortez testified falsely or that the State knowingly failed to correct such false testimony on the part of Madeline. Thus, defendant's contention is without merit.

■■ ■ The fourth contention on appeal, raised by defendant Batson and adopted by defendant Bunch, is that *voir dire* was inadequate

to disclose the jurors' potential racial biases. Specifically, defendants charge that the trial court erred in refusing to pose defense counsels' requested *voir dire* question regarding the jurors' potential for prejudice where both defendants were black and the victim was white.

The decision to permit supplemental questions by counsel in a *voir dire* examination is left to the discretion of the trial court. (*People v. Barnes* (1982), 107 Ill. App. 3d 262, 437 N.E.2d 848.) The standard for evaluating the court's exercise of its discretion is whether the means employed to test impartiality have created a reasonable assurance that prejudice would be discovered if present. *People v. Washington* (1982), 104 Ill. App. 3d 386, 432 N.E.2d 1020.

Here, prior to trial, counsel for defendant Batson asked the court to proffer the following question to the court:

"Knowing that the decedent in this case is white, the defendants are black, can you keep an open mind and be fair and presume the defendant innocent of these charges?"

The court rejected this question and ruled that it would instead ask the standard question concerning whether the jurors would permit prejudice to affect his or her judgment in reaching a verdict:

"Is there anyone here who would permit sympathy, bias or prejudice to affect their judgment in reaching their verdict? If so, raise your hand if you would permit sympathy, bias or prejudice to affect your judgment in reaching a verdict."

No jurors raised their hands after this question was asked.

■■■ We find that the trial court did not err in refusing defense counsel's tendered question. In addition to inquiring into whether any juror would permit sympathy, bias or prejudice to affect his or her judgment, the court gave each juror the opportunity to indicate whether any of these factors would keep them from being impartial jurors. Thus, defendants were given sufficient opportunity to discover any biases or prejudices, racial or otherwise, held by the jurors here.

The case relied upon by defendants, *Ham v. South Carolina* (1973), 409 U.S. 524, 35 L. Ed. 2d 46, 93 S. Ct. 848, is not applicable here. There defendant, a southern civil rights activist, claimed that he had been framed in retaliation for his civil rights activities. Hence, the court properly ruled that it was necessary to inquire into the possible racial prejudices of the jury. Such is not the case here. We thus reject defendant's contention.

■■■ ■ The fifth contention on appeal, raised by defendant Batson and adopted by defendant Bunch, is that defendants were denied a fair trial by the improper admission of photographs of the victim. Specifically, defendants maintain that a photograph of the victim prior

to the shooting, in which he appeared with his family, and explicit photographs of the victim at the scene of the shooting, served no other purpose than to inflame the jury.

Whether a photograph of a deceased person should be admitted into evidence normally rests within the discretion of the trial court and if such a picture has sufficient probative value it may be admitted in spite of the fact that the photograph may be gruesome and inflammatory. (*People v. Panzer* (1979), 73 Ill. App. 3d 1, 391 N.E.2d 467.) The trial court is granted the discretion to admit, if it chooses, photographs of the victim at the scene of the crime which are probative of any fact in issue. (*People v. Lindgren* (1980), 79 Ill. 2d 129, 402 N.E.2d 238.) Such photographs are probative if they reveal the cause of death, the amount of force used in the murder, the amount of blood on the premises, the condition of the scene of the crime and if they tend to corroborate the testimony of the witnesses. *People v. Lindgren* (1980), 79 Ill. 2d 129, 402 N.E.2d 238.

Here, the trial court admitted four photographs of defendant at the scene of the crime which portrayed the victim's body in the alley, a close-up of the victim's face and a close-up of the bullet wound to the head. These photographs were probative of the time, manner and location of the shooting as testified to by the Cortez sisters and Sergeant Robertson. They also reveal the cause of death as stated by the medical examiner Dr. Konacki at trial. The photographs further indicate the abrasions to the face suffered by the victim during the fight prior to the shooting, in corroboration of the Cortez sisters' testimony that the victim had been struck several times in the face by defendants. The photographs, although gruesome, accurately depict the violent crime that occurred. Thus, we find that the trial court did not err in admitting these photographs at trial.

Defendants also argue that the trial court erred in admitting a photograph of the victim, taken prior to the shooting, in which the victim appears with a group of five family members. Such photograph was used by the State at trial for purposes of identification and proof of life and death. Specifically, the victim's cousin, Richard Diorka, was shown such photograph when he identified the victim and testified to the victim's general physical condition prior to the shooting.

As the State asserts, and as defendants concede, this group photograph was cropped before it was sent to the jury, depicting only the victim. Thus, contrary to defendants' contentions, there is no indication that this photograph was a picture of the victim and his family. Defendants' argument that, although the specifics of the family photograph were removed, enough remains to allow the jury to speculate

upon the remaining portions, is without merit. We thus reject defendants' argument.

■■■ The sixth contention on appeal, raised by defendant Batson and adopted by defendant Bunch, is that defendants were prejudiced by the admission of the police photograph book which contained the pictures of both defendants among those of other street gang members. Defendants maintain that the admission of this "mug shot" book of members of the Latin Kings street gang improperly associated them with prior criminal activity.

In *People v. Adams* (1974), 22 Ill. App. 3d 665, 318 N.E.2d 278, this court held that such photographs may be admitted if they are used for the purpose of showing how defendants could have been accurately identified from them and not merely for the purpose of prejudicing the jury by showing defendants' prior unrelated encounters with the police. We found that the probative value of the photographs far outweighed any incidental prejudice to defendants. In *People v. Bleimehl* (1972), 9 Ill. App. 3d 273, 292 N.E.2d 60, an entire "mug book" which contained photographs of the defendants among others, was introduced into evidence to allow the jurors to see for themselves just how fair or unfair the photographic identification procedure had been. In *People v. Harrison* (1982), 106 Ill. App. 3d 341, 435 N.E.2d 1211, this court found that the admission of such photographs was not in error, noting that the photograph was imprinted with neither the name of the police department nor a prior date.

Here, the police photograph book was not admitted to indicate defendants' prior criminal activities, but to show the jury the photograph from which each defendant was first identified by the eyewitnesses. Admission of the photographs was also necessary to show the jury the accuracy with which the eyewitnesses identified each defendant and to allow the jury to judge the fairness of the photographic procedure. The photographs of defendants within the book were not inscribed with their names, the "Chicago Police Department" legend or the date on which they were taken. Nothing inscribed on or around the photographs suggested in any way that defendants had prior criminal records. Defendants' characterization of the photograph book as a "Latin Kings 'mug shot' book" is unsupported by the evidence. Thus, we find that the trial court did not err in admitting the police photograph book into evidence.

■■ The seventh contention on appeal, raised by defendant Bunch, is that defendant was denied his constitutional right to a fair trial when the State in rebuttal improperly impeached him with certified orders of his juvenile record. It should be noted initially that

defendant failed to object to the introduction of his prior juvenile record at trial or in his post-trial motion. Thus, defendant has waived this issue on appeal. *People v. Lucas* (1981), 88 Ill. 2d 245, 430 N.E.2d 1091; *People v. Jackson* (1981), 84 Ill. 2d 350, 418 N.E.2d 739.

■■ Moreover, defendant's contention is without merit. As defendant correctly asserts, prior adjudications of delinquency in a juvenile court proceeding are not admissible in a trial as impeachment evidence where the defendant testifies on his own behalf. (*People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695; *People v. Massie* (1985), 137 Ill. App. 3d 723, 484 N.E.2d 1213.) However, it is also settled that a prosecutor may cross-examine a witness regarding his prior convictions where the witness "opens the door" by testifying on direct examination regarding some aspect of his criminal record. *People v. Carradine* (1983), 114 Ill. App. 3d 82, 448 N.E.2d 569; *People v. Brown* (1978), 61 Ill. App. 3d 180, 377 N.E.2d 1201.

■■ Here, on direct examination, defendant Bunch testified that he had been arrested for auto theft as a juvenile. Bunch failed to specify the circumstances of his arrest and to clarify what had happened to the charge. Thus, it was not improper for the assistant State's Attorney to later present a certified copy of Bunch's prior adjudications of delinquency as a juvenile for the crimes of theft and possession of a stolen motor vehicle to clarify Bunch's juvenile arrest record for the jury.

■■■ ■ The eighth contention on appeal, raised by both defendants, is that they were denied their right to a fair trial where the assistant State's Attorney made improper comments during his closing and rebuttal arguments. Specifically, defendant Bunch first contends that the assistant State's Attorney improperly argued facts which were not in evidence to bolster the credibility of the State's witnesses when he suggested that other witnesses had described the shooting the same way as the Cortez sisters had:

"All surrounding circumstances proved that the Cortez sisters are telling the truth. *** Everybody else describes the scene in the same way as they do, they are reliable as to that."

It is noted initially that defendant failed to object to this statement at trial, thus waiving the matter on appeal. (*People v. Bartall* (1983), 98 Ill. 2d 294, 456 N.E.2d 59.) Moreover, defendant's contention that such statement was improper is without merit. Evelyn and Madeline testified at trial that they witnessed an assault upon the victim by defendants and three other youths after which defendant Batson shot and killed the victim in an alley as the victim ran from the scene. Sergeant Robertson corroborated this testimony with his own

statement at trial that he monitored a call of a man shot and arrived at the scene where he witnessed the victim's body laying in the alley. Thus, the record supports the prosecutor's comment that the Cortez sisters' description of the scene was corroborated. Defendant's contention that the prosecutor improperly implied that the Cortez sisters' testimony regarding the actual shooting was similarly corroborated is not supported by the record.

■■ ■ Defendant Bunch next contends that the prosecutor improperly placed the weight of the State's Attorneys' office behind defendant's guilt by putting his law license on the line as to the truth of defendant Bunch's statement. Specifically, the prosecutor remarked:

"If we are going to make something up and if we are going to get a state's attorney up here to put his law license on the line we are sure as heck going to make sure this says he did it."

Again, it is noted that defendant failed to object to this comment at trial, thus waiving the matter on appeal. (*People v. Bartall* (1983), 98 Ill. 2d 294, 456 N.E.2d 59.) Moreover, defendant's argument lacks merit. The prosecutor's comment here was made in response to remarks made by defense counsel during closing argument to the effect that defendant had been framed for the crime; such remarks suggested that the State's witness, the State's Attorney's office and the Chicago police department were lying. Thus, defense counsel's remarks invited a reply by the prosecutor. See *People v. Owens* (1982), 109 Ill. App. 3d 1150, 441 N.E.2d 908 (where the prosecutor's comment "I wouldn't be here if I didn't believe he was guilty" was invited by defense counsel's suggestion that the prosecutor had some personal motive or vendetta in the case.)

■■ ■ Defendant Bunch also contends that the prosecutor improperly commented on the victim's family when he remarked:

"I wish Joey Szafraniec could walk out of this courtroom and go home to his mother also. This is not going to happen though."

Again, this issue has not been preserved for review on appeal as defense counsel failed to object to this comment at trial. (*People v. Bartall* (1983), 98 Ill. 2d 294, 456 N.E.2d 59.) Moreover, such response was again invited by defense counsel, who asked the jury in his closing argument to return a verdict of not guilty and allow defendant Bunch to go home with his mother after spending nine months in jail awaiting trial. Ordinarily improper comments are not improper when clearly invited by the defense counsel's improper comments during closing argument. (*People v. Sutton* (1977), 45 Ill. App. 3d 739, 359

N.E.2d 1132.) Furthermore, common sense dictates that murder victims do not live in a vacuum and that, in most cases, they leave behind family members. (*People v. Bartall* (1983), 98 Ill. 2d 294, 456 N.E.2d 59; *People v. Free* (1983), 94 Ill. 2d 378, 447 N.E.2d 218, *cert. denied* (1983), 464 U.S. 865, 78 L. Ed. 2d 175, 104 S. Ct. 200.) Thus, defendant Bunch's argument is of no merit.

■■■ ■ Defendant Batson also contends that the prosecutor improperly commented on Batson's silence at trial, in violation of his fifth and fourteenth amendment rights. Specifically, the prosecutor remarked in rebuttal:

"They [defendants] say they [the police] are lying, they are flat out lying. They tell you they got a reason to lie, but has either one of those two gentlemen stepped up here and given you that reason."

Defense counsel objected to this remark and the objection was sustained by the court.

The appropriate test for determining whether a defendant's right to remain silent has been violated is whether the reference was intended or calculated to direct the attention of the jury to the defendant's neglect to avail himself of his legal right to testify. (*People v. Hopkins* (1972), 52 Ill. 2d 1, 284 N.E.2d 283.) Where the prosecutor's comments are motivated by a purpose of demonstrating the absence of any evidentiary basis for defense counsel's argument rather than a purpose of calling attention to the fact that defendant had not testified, such argument is permissible. (*People v. Dixon* (1982), 91 Ill. 2d 346, 438 N.E.2d 180; *People v. Jones* (1970), 47 Ill. 2d 66, 264 N.E.2d 189.) Moreover a defendant cannot claim that such remarks are in error where these remarks are in reply to and are invited by similar remarks by defense counsel. *People v. Dixon* (1982), 91 Ill. 2d 346, 438 N.E.2d 180; *People v. Vriner* (1978), 74 Ill. 2d 329, 385 N.E.2d 671, *cert. denied* (1979), 442 U.S. 929, 61 L. Ed. 2d 296, 99 S. Ct. 2858.

■■ Here, the prosecutor's remarks were in response to defense counsel's comments in closing argument that the State's witnesses, including the testifying police officers, were lying. The prosecutor's remarks were thus invited. Contrary to defendant Batson's claims, the prosecutor's reply was not calculated to call attention to defendant's silence, but for purposes of demonstrating the absence of any evidentiary basis for defense counsel's unsupported argument. Moreover, the trial court's action in promptly sustaining defense counsel's objection and in instructing the jury to disregard the comment cured any possible prejudice. Thus, the prosecutor's comments were not improper and did not violate defendant's fifth and fourteenth amend-

ment rights.

■■■ The ninth contention on appeal, raised by defendant Bunch, is that he was denied his constitutional right to the effective assistance of counsel.

In *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, the Supreme Court set forth a two-part test to determine the effectiveness of counsel. To prevail in his claim that his counsel was ineffective, a defendant must show that counsel's performance fell below an objective standard of reasonableness and that counsel's shortcomings were so serious as to deprive defendant of a fair trial. Defendant must also establish that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. The court further emphasized that the defendant must prove prejudice: "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington* (1984), 466 U.S. 668, 686, 80 L. Ed. 2d 674, 692-93, 104 S. Ct. 2052, 2064.

To assist lower courts, the Supreme Court also offered the following guidelines for applying its two-component standard: "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. *** If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland v. Washington* (1984), 466 U.S. 668, 697, 80 L. Ed. 2d 674, 699, 104 S. Ct. 2052, 2069-70.

Here, defendant Bunch maintains that his trial counsel, R. Frederic Solomon, was ineffective in that he failed to move to suppress defendant's oral statement at trial although defendant maintained he had been beaten by police, failed to move to suppress identification based upon suggestive photographs, and failed to object to the State's admission of his juvenile records and to the State's improper comments during closing argument.

*Defendant Bunch* submits that he probably would not have been convicted had his attorney not committed these alleged errors. A review of the record indicates that even assuming, *arguendo*, that all of the alleged errors constitute less than effective representation, they would not have altered the result of this case. Thus, defendant Bunch was not prejudiced by these alleged errors on the part of counsel. Accordingly, there is no need to review the individual claims of inade-

quate representation to determine whether counsel acted within the range of reasonable professional assistance.

■■ The tenth contention on appeal, raised by defendant Batson, is that the trial court committed reversible error when it failed to instruct the jury on voluntary manslaughter.

Voluntary manslaughter is defined as follows:

> "A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:
> (1) The individual killed ***." Ill. Rev. Stat. 1983, ch. 38, par. 9—2(a).

It is settled in murder cases that if there is evidence which, if believed by the jury, would reduce the crime to manslaughter, an instruction defining manslaughter should be given. (*People v. Lockett* (1980), 82 Ill. 2d 546, 413 N.E.2d 378; *People v. Falkner* (1985), 131 Ill. App. 3d 706, 475 N.E.2d 964.) It is also well settled, however, that "if the evidence in a criminal case admits of but one conclusion, which is that the accused is guilty of the crime charged, it is error to give an instruction authorizing a conviction for a lesser offense." (*People v. Rangel* (1982), 104 Ill. App. 3d 695, 700, 432 N.E.2d 1141, quoting *People v. Preston* (1930), 341 Ill. 407, 173 N.E.2d 383.) Thus in a homicide case, an instruction should not be given on the lesser included offense of voluntary manslaughter if the evidence clearly demonstrates that the crime was only murder and there is no evidence upon which the jury might find the defendant guilty of manslaughter. *People v. Lockett* (1980), 82 Ill. 2d 546, 413 N.E.2d 378.

Here, the evidence indicates that the victim was surrounded and attacked by five assailants, including defendants Batson and Bunch. During the assault, Bunch and Batson stepped away from the others and Bunch removed a handgun from his waistband and handed it to Batson. Moments later, the victim broke free and began to flee from the group. As the apparently unarmed victim ran into an alley, he was shot in the back of the head by Batson. The victim fell to the ground, fatally wounded.

■■ Contrary to defendant's argument, there was no sudden and intense passion or severe provocation to bring this case within the purview of the voluntary manslaughter statute. Rather, the fact that defendant Batson left the scene, returned with Bunch's gun and shot at the back of the fleeing victim negates such claim. Accordingly, we find that the trial court did not err in refusing to give such instruction on voluntary manslaughter to the jury.

518

■■ ■ The eleventh and final contention on appeal, raised by both defendants, is that their sentences are excessive. Both defendants were found guilty of murder and sentenced to terms of 30 years' imprisonment to be followed by three years' mandatory supervised release.

It is noted initially that murder carries a determinate prison sentence of 20 to 40 years (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1(a)(1)) and a term of mandatory supervised release of three years (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1(d)(1)). Thus, defendants' 30-year sentences are clearly within these guidelines. In imposing a sentence, a trial court may look to many factors, including the defendants' general moral character, habits, mentality, social environment, age and inclination to commit crime. (*People v. Jones* (1985), 132 Ill. App. 3d 764, 477 N.E.2d 836.) Moreover, the trial court has wide discretion in imposing a sentence within the statutory limits. (*People v. Stambor* (1975), 33 Ill. App. 3d 324, 337 N.E.2d 63.) While a trial court is required to consider a defendant's rehabilitation potential in sentencing him, the court is not required to give greater weight to that consideration than to the seriousness of the crime. (*People v. Nelson* (1985), 130 Ill. App. 3d 304, 474 N.E.2d 23.) Appellate review of sentencing is limited; in the absence of an abuse of discretion, the sentence may not be altered on review. *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.

Here, the court considered evidence that defendant Bunch had been adjudicated delinquent for auto theft, robbery and residential burglary. The court also considered evidence that Bunch had been arrested three times as a juvenile for possession of marijuana. The court further considered the circumstances of the crime itself. Defendants and three companions retaliated against a prior assault on a friend by individuals reputed to belong to the same street gang as the victim by attacking the apparently unarmed victim. As the victim struggled with his assailants, defendants stepped away from the scene momentarily and Bunch retrieved a handgun from his waistband which he gave to Batson. Defendants returned to the fight and, as the victim broke free and fled toward an alley, Batson shot him in the back of the head.

■■ In mitigation, the court considered evidence that defendant Batson had no prior convictions, no drug or alcohol problems and came from a strong family environment. In light of defendants' age, counsel pled for leniency in sentencing. The court commented that it was difficult to sentence the youths to long prison terms, but added that it must be done to preserve the integrity of society. We find that,

given the heinous and brutal nature of defendants' crime, the trial court's sentence was not improper.

In light of the foregoing, we affirm the judgment of the trial court.

Affirmed.

HARTMAN and BILANDIC, JJ., concur.