THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
EARL MOORE, Defendant-Appellant.

First District (2nd Division)   No. 1—87—0464

Opinion filed May 21, 1991.—Modified on denial of rehearing
July 30, 1991.

Michael J. Pelletier and Karen Daniel, both of State Appellate Defender's Office, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb and David Stabrawa, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE SCARIANO delivered the opinion of the court:

Earl Moore appeals from his jury convictions for attempt (murder) and armed robbery, claiming that his trial was unfair in that: during closing arguments, the State improperly remarked on his failure to testify and argued facts not in evidence; testimony about his criminal background and that the State's Attorney approved the prosecution against him was wrongfully admitted; the trial judge impermissibly communicated with the jury during its deliberations; and a juror was inappropriately separated from the rest of the jury panel during deliberations. He seeks reversal of his convictions and a remand of his cause for a new trial.

Moore was tried for the July 22, 1985, shooting and robbery of Peter DiVizio. DiVizio testified that he was a messenger for an armored car company at the time of the incident, and that his route included a stop at a grocery store on North Sheridan Road, in Chicago. He and his partner parked in front of the store at around noon.

DiVizio carried a bag of money into the store and dropped it off at the "courtesy counter." He then received three bags containing cash, checks and food stamps, with a combined worth of about $22,000. He placed the bags containing the cash and checks into a larger "cole" bag, and carried it and the bag containing the food stamps out of the store. As he approached his truck, he heard someone yell, "Hey." He looked in the direction from which the voice was coming and saw Moore, about 40 feet away by an exit on the east side of the building, clutching something in his hand. DiVizio then heard a "bang," felt a sharp pain in his abdomen and fell to the ground, dropping the bags as he collapsed. After hearing another shot and someone running up and grabbing the bags, DiVizio crawled under the truck. He did not view the person who grabbed the bags.

Approximately two or three weeks after the shooting, the police showed DiVizio five photographs, from which he identified Moore's photo as that of someone who resembled his assailant; but he was

not positive about his identification, saying that he would "ha[ve] to see him in person." On August 11, 1985, DiVizio identified Moore in a police lineup, saying that he "thought it was him," his doubts stemming from Moore's hair being shorter than he had remembered. DiVizio also testified that he couldn't see the gunman's eyes because the assailant was wearing sunglasses, and that the gunman was wearing a white hat, similar to a "navy hat," with the flaps pulled down and which covered part of the man's head. At trial, DiVizio also testified that he was "positive" about his identification, asserting that he had "been having flashbacks, dreams and I could just see his face that I remember."

Kimberly McHugh, a stock clerk for the grocery store, got off work at noon on the day of the incident. After shopping at the store for about 10 minutes, she left with her groceries through the exit on the east side of the building, where she noticed a man about two feet away, wearing a black coat, black pants and black shoes; she took note of the man because he seemed "overly dressed" for a "hot July day." McHugh testified that the man was black, that he was "fairly young," wore mirrored, dark sunglasses, was of medium build, between 145 and 160 pounds, wore a hat, and was clean shaven.

The man looked back and forth between the parking lot and the inside of the store. McHugh stated that from his vantage point, he had a direct view of the courtesy booth where "all the money" is kept. After observing the stranger for about a minute, she walked to her car, drove it over to where her cart was and noticed that the man was still there. When he saw her return, the man walked into the store and then back out of the store through the same exit. After the incident, the police showed McHugh several photographs, of which she identified one as that of the man she saw outside the grocery store; that picture, however, was not of Moore. On August 11, 1985, she identified Moore in a police lineup. McHugh identified Moore in court as the man she saw, acknowledging that she did not witness the robbery.

Walter Lewis was working as a bus driver at the time of the robbery. He was speaking with his supervisor on Sheridan Road, just north of and on the same side of the street as the grocery store. He heard two gunshots come from the direction of the store, and while his supervisor walked across Sheridan, Lewis maintained his position and looked in the direction of the store. He saw a man, whom he described as a black male, approximately 5 feet 10 inches to 6 feet tall, wearing a white and black shirt, a white cap, sun-

glasses and white "utility gloves," run toward him and across Sheridan, carrying a money sack of the kind "used at banks" in his left hand, and a "nickel plated automatic weapon" in his right hand. The man ran into an alley leading to a parking lot on the opposite side of Sheridan; about a minute to a minute-and-a-half later, Lewis saw the man as a passenger in a white station wagon driven slowly by a black male, shorter and stockier, who was not wearing a cap. The passenger was still wearing his hat and sunglasses, but Lewis could see only his profile, rather than his entire face. Lewis identified Moore in a police lineup on August 12, 1985, and then at trial, as the man he saw leaving the store with the gun and money sack.

Lovelace Coston testified that he owned an auto body shop at the time of the incident and that he knew Moore. During the middle of July 1985, Moore came into his shop and asked him to work on a white station wagon. When confronted with photographs of a white station wagon identified earlier by Lewis as being the one in which he saw Moore, Coston testified that it was "similar."

John Redmond, an evidence technician for the Chicago police department, testified that he found two .30 caliber cartridge cases near the scene of the crime on the day of the shooting.

Conrad Pagan testified that he was on duty as a Chicago police officer when the shooting took place. After arriving at the crime scene in response to a call about an armed robbery and about a white vehicle heading north from the scene, Pagan discovered a white station wagon in an alley; and from the same photographs as those from which Lewis identified the car as the one he saw being used by Moore, Pagan identified it as the one he found. The vehicle was listed as a stolen car. Robert Dieringer, a crime lab technician for the Chicago police department, examined the car along with his partner and found a .30 caliber cartridge case on the passenger side of the auto and a white glove on the front seat. They also recovered a fingerprint impression from the exterior portion of the passenger-side window. Further, according to John DuShane, an employee of the identification section of the Chicago police department, another fingerprint was found on the driver's side seat belt; neither, however, was Moore's.

Philip Mannion, a Chicago police officer, testified that on August 11, 1985, he and his partner were given a photo of Moore and a description of a 1978 Oldsmobile he was alleged to be driving. After locating the vehicle, other officers arrived. When Moore arrived and drove off in the car, Mannion's car and three other unmarked

vehicles followed. When Moore stopped at a traffic light, the other vehicles stopped behind and next to him. When the light changed, Moore drove off "at a high rate of speed." Employing flashing lights and sirens, the police cars gave chase; the chase ended when Moore lost control of his car and struck another car. He was then arrested.

Lawrence Thezan, a Chicago police officer, testified that he investigated the robbery and shooting. He spoke with Deborah Tucker during the first week of August 1985, after which he began to look for Moore. After Moore's arrest, Thezan informed him that he was being charged with armed robbery. Moore later asked to speak with him in the "interview room," and told him "that if he beat this case he would tell me who the second person was that was with him during the robbery." At the time of his confession, Moore was handcuffed to a wall, and had been so handcuffed for the previous 36 hours, except for the periods during which he was questioned. Moore had been interrogated several times while in such custody, and was also required to participate in some lineups. Thezan further testified that he did not take a written statement from Moore and that he alone heard Moore's confession.

Janice Vaughns testified that she was a good friend of Debra Tucker and through her met Moore in 1985. On the Sunday after she met Moore, she was speaking with him when he began "talking about, just things in general that people have did or was trying to do or would like to do. And he brought the subject up about hitting an armed car." The next day, Vaughns heard on the radio about the robbery at the grocery store. Two or three days later, she was at Tucker's apartment when Moore arrived carrying a brown paper bag. He opened the bag onto Tucker's kitchen table and poured "money, checks and food stamps" from the bag. A man, whom she tentatively identified as "Zeke," then came to the apartment and spoke with Moore about the "armored car robbery." While they spoke, there was a pistol on the table and another on the bed. Vaughns stated that Moore referred to one of the pistols as the one "that he had shot the armored car driver with." She also heard that "the white station wagon was supposed to have been involved," and that "some guy was going to get rid of the station wagon and clean it up." She described one pistol as short, the other as about a foot long, with a brown handle.

On cross-examination, Vaughns testified that she was questioned by the police several weeks after the robbery, but that she said nothing about Moore's statement about robbing an armored car, or

about the conversation between him and "Zeke." She did, however, tell the police about Moore's dumping of cash and food stamps on Tucker's table, about seeing the pistols, and about the plan to clean fingerprints off the white station wagon. Further, she stated that Tucker and Moore had been sexually involved.

Thezan testified that he and his partner interviewed Vaughns around August 12, 1985, and that she told the officers that she heard Moore plan the robbery; she said nothing, however, about his statement about "hitting an armored truck." Vaughns also told the officers that the day after first meeting Moore, they ate Chinese food together. She saw that he had a gun, asked him what he was doing, and received the reply, "Nothing." Vaughns also told him that Moore had admitted shooting an armed guard, had dumped cash out on Debra Tucker's table and had admitted involvement in the robbery. She said nothing to him about the station wagon or about cleaning fingerprints from it.

Norman Anderson was on his rounds as a meter reader for Commonwealth Edison on the day of the crime. After making some phone calls at the grocery store, he proceeded to cross the street, and heard what he thought was the backfire of a car. He then saw a man, whose face he could not see, and who was carrying a handgun, run south on Sheridan, crossing the street as he ran. Anderson then saw another man approximately 20 feet away, who was getting up from the ground. The second man was wearing mirrored glasses, had a green sweatshirt on and was wearing a hat similar to a sailor's hat. The man had an incompletely grown-in beard, and a mustache. Anderson saw the man run north on Sheridan Road on the side of the street opposite the grocery store. Anderson was unable to identify Moore as the person he saw, testifying that he saw the man's face for only a second, but that Moore "could have been" the man he saw.

Joseph Christiano testified that he was a private investigator and had been asked by Moore's defense counsel to measure the distance from the location from which Lewis viewed the perpetrator to the parking lot across Sheridan from the grocery store. By pacing the distance off, he estimated it as being about 160 feet. From Lewis' location to the spot where the shooting took place, he similarly estimated the distance to be about 305 feet.

Paul Carroll testified that after the robbery, he showed McHugh several photographs. McHugh picked out a picture of a person whom she said "resembled" the perpetrator, except for differences in his hair, in the fullness of his face, and except that the perpetra-

tor did not have a prominent mustache like the man in the photograph.

Moore was convicted by a jury on December 10, 1986, of armed robbery and attempt (murder). He was sentenced to an extended term of 60 years in the custody of the Illinois Department of Corrections.

Moore first contends that the circuit court abused its discretion when it overruled his objections to the following prosecutorial statement during the State's rebuttal argument:

> "Where are the proceeds [of the crime]? Where are the guns?
>
> Well, I'll tell you, I know one guy who knows where they are, and he is sitting over here in this chair."

Moore argues that the statement brought to the jury's attention his failure to testify, violating his right not to be compelled to testify against himself as enunciated in the fifth amendment to the United States Constitution (U.S. Const., amend. V), in section 10 of article I of the Illinois Constitution (Ill. Const. 1970, art. I, §10) and in division 12, section 6, of "An Act to revise the law in relation to criminal jurisprudence" (Ill. Rev. Stat. 1985, ch. 38, par. 155—1). The State replies that the comments were not intended to draw the jury's attention to Moore's failure to testify; rather, they were a justifiable response to Moore's argument, during closing, that:

> "I told you in opening statement that the police never recovered any of the money and they never recovered any of the proceeds, the stamps. And they never recovered any of the guns that were used in the robbery.
>
> After they arrested Earl Moore, did they go to his apartment? Did they find 11 Thousand Dollars in cash? Did they find food stamps, did they find guns? No."

Moore's counsel continued by arguing that the robbery was committed by one "who wanted the money and wanted it then" and that if Moore had stolen the money he would have been spending it and flashing it around.

■ "The prosecution cannot directly [citation], or indirectly [citation], comment on the defendant's failure to take the stand in his own defense." (*People v. Lyles* (1985), 106 Ill. 2d 373, 390. See also *Griffin v. California* (1965), 380 U.S. 609, 615, 14 L. Ed. 2d 106, 110, 85 S. Ct. 1229, 1233.) "The test *** of whether the defendant's fifth amendment guarantees were abridged is whether 'the reference [was] intended or calculated to direct the attention of the jury to the defendant's neglect to avail himself of the legal right to

testify.' " *People v. Quinn* (1988), 173 Ill. App. 3d 597, 602, quoting *Watt v. People* (1888), 126 Ill. 9, 32.

For example, in *People v. Thomas* (1980), 89 Ill. App. 3d 592, 601-02, a prosecutor objected to defense questions which implied that the witness on the stand was the only person who could testify as to what had occurred during a robbery. In objecting, the prosecutor remarked that there was "another person in this courtroom who can tell us what happened." Even though the remark could have referred to a victim of the crime who had been present for most of the proceedings, the court found error.

Even more oblique references to a defendant's failure to testify have been found to be improper. In *People v. Weinger* (1981), 101 Ill. App. 3d 857, 869, the court held that the prosecutor's comment that " 'the evidence that we *** have presented to you is uncontradicted and undenied' *** was erroneous and improper." " 'Where the State's case is not in fact unchallenged, *** [t]he only reasonable point to the comment is the defendant's silence.' " *Weinger*, 101 Ill. App. 3d at 869, quoting *People v. Escobar* (1979), 77 Ill. App. 3d 169, 178. See also *People v. Morgan* (1960), 20 Ill. 2d 437, 441 (error resulted from repeated reference to witness as the "only witness for the defense").

■ We see no significant difference between the comment in *Thomas* that "another person in this courtroom *** can tell us what happened" (*Thomas*, 89 Ill. App. 3d at 601), and the comment in the instant case that "I know one guy who knows where they [the criminal proceeds and the guns] are, and he is sitting over here in this chair." In both instances, the prosecutor alleged that the defendant had important information, and such allegation called to the jury's attention the defendant's failure to testify about whether he actually had that knowledge.

Nevertheless, "a defendant may not claim prejudice from comments by the prosecutor when those comments were invited by defendant's argument." (*People v. Richardson* (1988), 123 Ill. 2d 322, 356. See also *People v. Dixon* (1982), 91 Ill. 2d 346, 350-51.) In *Dixon*, the defendant was accused of participating in violence at a jail. Defense counsel asked the jury to keep in mind what was going on in the defendant's mind regarding racial tensions at the institution, and in rebuttal, the prosecutor asked the jury whether it had heard any testimony about what was transpiring within the defendant's mind; no error was found. 91 Ill. 2d at 349-50.

In *People v. Bunch* (1987), 159 Ill. App. 3d 494, the defendants argued in closing, without any support, that the State's witnesses

were lying and had a reason to lie; the prosecutor responded by asking the jury, "has either one of those two gentlemen stepped up here and given you that reason[?]." While the court held that any prejudice was cured by the court's sustaining of defense counsel's objection and by its instruction to the jury to ignore the statement, the court also held that the response was nevertheless justifiable and not improper. 159 Ill. App. 3d at 515.

The State also puts forth *People v. Johnson* (1986), 114 Ill. 2d 170, 201, to support its argument that Moore invited the comment. In *Johnson*, the prosecutor implied that the defendant had, for several months, hidden evidence of his wrongdoing. Because there was evidence that he had in fact hidden evidence, and because the remarks were considered invited by defense counsel's suggestion that it was "incredible" that no physical evidence linking defendant to the crimes was discovered until eight months after they occurred, no error was found. In the instant case, there was evidence, most notably Janice Vaughns' testimony that following the robbery Moore dumped the proceeds onto Debra Tucker's kitchen table, and that he referred to a pistol in his possession as the one he had used in the crime, from which the jury could easily have inferred that Moore knew where the spoils of the crime and the guns were. Further, as in *Johnson*, Moore pointed out a weakness in the State's case by discussing the lack of physical evidence linking him to the crime; the State responded with an explanation of the whereabouts of such evidence. Moreover, in *People v. Shum* (1987), 117 Ill. 2d 317, 347-48, in which the defendant had argued that the State's failure to produce the gun used in the crime showed his innocence, the prosecutor argued that the defendant had "ditched" the gun. The court found no impropriety:

> "While there was no eyewitness testimony that this defendant concealed the gun in question, it is a legitimate inference based upon that fact that a gun was used in the assault and was not recovered." 117 Ill. 2d at 347-48.

Accordingly, we hold that despite the similarity of the prosecutorial comments in the instant case to comments which would ordinarily be held to improperly draw attention to the defendant's failure to testify, the comments were supported by the evidence and were a proper response to Moore's closing argument. In any event, even if we were to assume, *arguendo*, that the trial judge abused his discretion in overruling defendant's objection to the prosecutor's statement in his rebuttal argument to the jury, the evidence against

the defendant in this case was of such massive proportions as to render the error harmless.

Moore raises other alleged errors, to which the State replies that because he failed to preserve the issues by both objecting at trial and raising them in his post-trial motion, his right to their review has been waived.

During Moore's cross-examination of Detective Thezan concerning the detective's testimony that Moore had admitted his involvement in the armed robbery, Thezan testified that Moore's statement was never reduced to writing because, "He wouldn't have signed a statement." During the State's redirect examination, the prosecutor asked, "How do you know he wouldn't sign the statement?" Thezan replied, "During the course of our conversations that we were having, Mr. Moore was telling me about his background. He had stated to me that once before he told the police officer something —. *** And he said that it wouldn't come out in court anyway." Moore avers that the statement was inadmissible because it served as evidence of offenses he committed other than that for which he was on trial.

Next, Moore points out that during Thezan's testimony, the State asked when Moore was charged in the case. Thezan replied that Moore was not charged until after the police had "contacted the State's Attorney's Office, felony review unit to review the case." Thezan then stated, "He was charged after the state's attorney reviewed the case." This testimony, according to Moore, prejudiced the jury by placing an official imprimatur on the filing of charges, leading the jury to believe that someone in authority had reviewed the case and had found it to bear substantial weight.

Next, Moore claims that during closing argument, the State argued that Moore bragged to his girlfriend about robbing the armored car. According to the State, Moore did not anticipate that, "sometime in August Debra Tucker would call Officer Fitzsimmons and Thezan of the Chicago Police Department and say, 'I know who did the Dominick's [grocery store].' " Moore alleges that there was no evidence to support such an allegation, and that by commenting on the substance of a conversation between the nonwitness Tucker and the police, the State was attempting to introduce evidence that was otherwise inadmissible hearsay.

Finally, Moore claims that during closing arguments the State improperly implied that Moore had threatened possible witnesses against him. The prosecutor stated:

"Earl Moore, at the time he was bragging, was impressed with himself. Did not expect anyone to ever talk about it or he was relying upon these people's friendship, the fact they would be impressed with his great accomplishment, or he knew he could frighten these people to never talk."

Moore argues that the statement was improper because there was no evidence that he could frighten possible witnesses from talking.

▇ Moore failed to both object to the aforementioned statements and to preserve them as issues in his post-trial motion; accordingly, because of the strength of the State's case, the alleged errors could not reasonably have affected the verdict, and he has waived their review. (*People v. Mullen* (1990), 141 Ill. 2d 394, 401-02.) Moore points out that in *Mullen,* the court examined a claim that the State had argued to the jury, without supporting evidence, that one of the State's witnesses had initially been reluctant to testify because he feared getting shot in the back in retribution. The court held that the comment, made despite specific instructions from the trial judge to refrain from commenting on the witness' initial reluctance, was of " 'such magnitude that the commission thereof denie[d] the accused a fair and impartial trial.' " 141 Ill. 2d at 404, quoting *People v. Carlson* (1980), 79 Ill. 2d 564, 576-77.

▇ We hold that the alleged errors neither presumptively denied Moore a fair trial, nor could they reasonably have affected the verdict; accordingly, there is no basis for excepting the aforementioned issues from the impact of the waiver rule. Three eyewitnesses identified Moore as being at the scene of the crime, while other testimony placed him in a getaway car. There was also testimony that he had possession of a gun and of proceeds connected with the crime, and that he confessed to the crime. While much of the evidence was vigorously attacked, most notably the identification of Moore at the crime scene by DiVizio, McHugh and Anderson, as to which there was conflicting testimony about whether the perpetrator had a beard, there was no contradiction about Lewis' identification of Moore, nor about testimony that Moore confessed to the crime and had a firearm and proceeds from the incident. Finally, Moore's attempt to discredit Lewis' testimony by measuring large distances between the crime scene and Lewis' location were irrelevant, since they did not measure the distance between Lewis' location and some of the locations where he claimed to have seen Moore.

Further, unlike in *Mullen,* where the jury was aware of a witness' reluctance to testify, and could therefore have been prejudiced by the

prosecutor's violation of a specific order by proceeding to explain that reluctance, the comment that Moore thought he could frighten witnesses did not relate to anything the jury had perceived; no witnesses appeared to have been so intimidated, and the effect on Moore's trial was harmless. The other alleged errors: the implication that Moore had previously given a statement to an officer and the comment that Moore was not charged until after the State's Attorney reviewed the case, were both sufficiently oblique and ambiguous as to negate any prejudicial effect on the jury. We hold, therefore, that the alleged errors did not deprive Moore of a fair trial.

Moore's remaining claims of error concern incidents which allegedly occurred during jury deliberations. First, Moore alleges that from about 6:05 to 6:20 in the evening of the final day of jury deliberations, a juror was absent from the jury room. Within 15 minutes after that juror returned, the panel indicated that they had reached a verdict. This separation, argues Moore, violates sections 115—4(l) and (m) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, pars. 115—4(l), (m)):

> "(l) When the jury retires to consider its verdict an officer of the court shall be appointed to keep them together and to prevent conversation between the jurors and others ***.
>
> (m) [A]ny juror *** shall be permitted to separate from other such jurors [of his panel] during every period of adjournment to a later day, until final submission of the cause to the jury for determination ***."

Moore then claims that at the jury's request, the trial judge improperly provided the panel with a dictionary which had not been admitted into evidence. He allegedly so acted without the knowledge or presence of Moore or his counsel, thus violating Moore's right to be present at all stages of his trial.

Finally, Moore contends that during the jury's deliberations, the trial judge improperly inquired, in the absence of defense counsel, how much longer they needed to deliberate, and that such inquiry allegedly hastened the verdict.

In support of these claims Moore notes the following exchange, which occurred before the jury returned its verdict:

> "DEFENSE COUNSEL: Judge, for the record, we have three motions. First motion is, by my watch, from about 6:05 to 6:20, one of the jurors whose name I forget was, I can look it up if necessary, was out of the jury room, and that was about, little less than 15 minutes after that the buzzer rang three times [indicating that a verdict had been reached]. I think

848

at that critical stage it was improper for that juror to be let out of the room.

THE COURT: All right. That motion is denied.

DEFENSE COUNSEL: The second motion is, *** the sending back of the question as to how much longer the jury has to go we think was unduly coercive.

THE COURT: All right. That motion is denied.

DEFENSE COUNSEL: Third motion is, giving the jury the dictionary which they requested.

THE COURT: That motion is denied."

Moore avers that his post-trial motion contained detailed descriptions of these allegations and that during the hearing on the motion, his counsel asked whether "the court has any questions, or wish any clarification on any of the points made in the motion." The court replied, "No, your motions are very clear," and denied the motion without further comment. Moore claims that it is "inconceivable" that the trial judge would not have challenged his allegations if they were false. He points to no other evidence in the record that the alleged improprieties occurred.

■■ "Responsibility for preserving and presenting a sufficient record of the asserted error necessarily falls on the party who makes the assertion of error." (*People v. Smith* (1985), 106 Ill. 2d 327, 334-35.) "A court of review must determine the issues before it solely on the basis of the record made in the trial court." (*People v. Reimolds* (1982), 92 Ill. 2d 101, 106-07.) "Where the record is insufficient or does not demonstrate the alleged error, the reviewing court must refrain from supposition and decide accordingly." (*People v. Edwards* (1978), 74 Ill. 2d 1, 7.) The trial judge's failure to deny Moore's allegations no more constitutes proof of their truth than Moore's failure to deny the charges against him constituted proof thereof. (See discussion above regarding the allegedly improper prosecutorial comments.) Although affidavits or juror testimony could have been proffered to support the allegations (see *People v. Schuld* (1988), 175 Ill. App. 3d 272, 280; *People v. Boyce* (1977), 51 Ill. App. 3d 549, 562), we have been offered nothing in the record to assist us in deciding whether the alleged incidents occurred; hence, we decline to review the issues.

For the foregoing reasons, Moore's conviction is affirmed.

Affirmed.

HARTMAN and DiVITO, JJ., concur.