THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MARK FERNS, Defendant-Appellant.

First District (6th Division)   No. 1—89—1723

Opinion filed May 14, 1993.

Randolph N. Stone, Public Defender, of Chicago (Kyle Wesendorf, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Donald Lyman, and John Magro, Assistant State's Attorneys, of counsel), for the People.

JUSTICE EGAN delivered the opinion of the court:

The defendant, Mark Ferns, was indicted for the first degree murder and aggravated criminal sexual assault of Ruth Casillas. He was convicted of first degree murder and aggravated criminal sexual assault and was sentenced to 80 years' imprisonment for first degree murder and 30 years for aggravated criminal sexual assault, the sentences to be served concurrently. The defendant appeals only from his conviction for first degree murder. He first contends that the evidence was insufficient to support the jury's determination that he committed first degree murder.

Ruth Casillas, also known as "Susie," lived with her boyfriend, Jose Alvarez. She and Alvarez were at a bar at approximately 7 p.m. on March 26, 1988, when they purchased a ring from the defendant, whom they both knew. The defendant left the bar. Alvarez saw Casillas drink four beers at the bar between 5:30 p.m. and 7:30 p.m. Alvarez went home at around 7:30 p.m.

At approximately 3:30 a.m. on March 27, 1988, Chicago police officer Swistowicz was assigned to meet a possible robbery victim. Swistowicz and his partner met the defendant, the alleged robbery victim; the defendant was waiting for them in the street in front of his house. He did not appear to be excited, but did have a small cut on his lower lip. He had a scratched and red right hand. The defendant said that he had been drinking. The defendant looked sober to Swistowicz.

The defendant told Swistowicz that he was robbed at the intersection of 38th Street and Kedzie Avenue while he was stopped in his car at a traffic light. He explained that two men reached into his car, hit him in the mouth, dragged him out of his car, and kicked him in the face and chest. The two men took his car and a black leather jacket; the defendant then went to his house to call the police.

The police officers took the defendant to St. Anthony's Hospital to obtain medical attention for the defendant and to make phone calls. When they arrived at the hospital the defendant told Swistowicz he did not need medical attention. The defendant told the officers that there was an Hispanic woman named Susie in his car with him when he was robbed.

Chicago police detective Ceaser and his partner met Swistowicz and the defendant at 5 a.m. at the hospital. The defendant told Ceaser that at approximately 2:30 a.m. he and Susie were en route to a tavern located at Archer Avenue and Kedzie Avenue when they were attacked; Susie had asked the defendant to take her to that tavern, but he was not sure where it was. Ceaser and the defendant left

the hospital and tried to find the tavern, but were unsuccessful. The police learned Susie's address and went to her apartment, where they met Alvarez. Alvarez explained that Susie might be his girlfriend, Ruth Casillas, and that she had not returned home.

Alvarez accompanied the defendant and Ceaser back to the hospital, where Ceaser learned that a woman's body had been discovered at 33rd Street and Kedzie Avenue. Ceaser then took Alvarez and the defendant to a police station. At the station, the defendant told Ceaser the following: He had been driving around and drinking with some friends earlier in the evening on March 26 when they went to a tavern where they met Susie. Susie asked the defendant to help her search for Alvarez, and the two went to another bar where Susie had a beer with a man and danced with another man. Susie became upset and again asked the defendant to help her find Alvarez. They left in his car and were robbed. The defendant told Ceaser that one of the robbers drove away with Susie in the defendant's car while another followed in a dark car.

Officer Bruce Johnson was searching for the defendant's car. He drove behind the WVON radio station at 33rd Street and Kedzie Avenue and discovered Casillas' body at approximately 5:30 a.m. on March 27. The road leading behind WVON is a dirt road that is "[v]ery bumpy, very narrow, about a car and a half [in] width." When Johnson drove down the road, he saw the body of a white female. He then left the scene by backing his car out the dirt road and went to locate his sergeant.

Chicago police detective Grimaldi went to the scene where the body was located. There was debris such as roofing materials, siding, and tires along the dirt road. The dirt road was the only way in and out of the area behind the radio station. He observed the woman's body. Her skull appeared to be crushed, she was lying facedown on the ground, there was blood and matted hair around her head, she was wearing jeans that were pulled down around her left ankle leaving her naked from the waist down, she did not have a shoe on her right foot, and one of her shoes was on the ground approximately 15 feet from her head. The exposed part of her body had bruises, cuts, scratches, and feces on it. There was a car bumper to the north of her body that had "blood splattered and matter on it," and there was blood and "matter" on nearby wood and fencing. Grimaldi searched the area but did not find a crowbar, tire iron, or any similar object.

Grimaldi learned that the woman was Casillas; he left the scene to go the station to talk to the defendant. He spoke with the defendant and Detective Elliott, and then located John Galvin, a friend of the

defendant. Galvin and Efran Cantu, another friend of the defendant, came to the police station where Grimaldi spoke with both men. Then, Grimaldi "reinterviewed" the defendant at approximately 1 p.m. Elliott read the defendant his *Miranda* rights and the defendant then made a statement to Grimaldi and Elliott. The defendant was arrested for first degree murder at 1:30 p.m.

Chicago police detective Harris located the defendant's 1977 Oldsmobile in Cicero, Illinois. The bumper and molding found at the scene where Casillas' body was found came from this car. Harris noticed that the rear bumper was missing and that there was no tire iron, hammer, or crowbar in the car. Harris went to the scene where Casillas' body had been found and saw the car bumper and its plastic molding. He and his partner put the bumper and molding in their car trunk and took them to the crime lab to be processed; the mobile crime laboratory never processed these items at the scene. According to Harris, the bumper had "blood and gray matter on it." Harris attempted to turn his car around at the scene but could not; he backed out on the dirt road.

The defendant's car was examined by several Chicago police department employees while it was in Cicero. Mobile crime laboratory officer Keating found blood on the driver's door with a hair-like fiber in it, blood on the passenger headrest covering "quite a bit of the area that you would be placing your head on," a small pool of blood on the driver's side floor, blood on the rocker panel of the driver's door, blood on the passenger and driver's seats, and a large fecal stain on the passenger's seat. Keating also observed blood on the trunk lid near the right front fender. He also found a juice bottle and a whiskey bottle in the car. The defendant's fingerprints were on the whiskey bottle.

Christine Braun, a serologist from the City of Chicago crime detection laboratory, testified that Casillas had type A blood and that the blood from the scene and on the bumper, molding, and headrest was type A. Several items of the defendant's clothing tested positive for the presence of blood, although Braun could not determine how long the blood had been on these items. Forty-four percent of the United States population has type A blood.

The Cook County deputy medical examiner, Mary Jumbelic, performed the autopsy on Casillas' body. Jumbelic found 24 injuries on Casillas' head, including seven "pattern" injuries that were consistent with the use of a blunt instrument and that indicated to a reasonable degree of medical certainty that the head struck or was struck by "something patterned." The "most significant" injury on the head

was a "very large open wound" on the right side of the head measuring 6 inches by 4.5 inches that went completely into the skull. Jumbelic testified that the skull was crushed and "a lot of the brain material beneath it was gone." Casillas also had bruising on her scalp and eyes and lacerations on her head and in her mouth. On her buttocks and one leg she had "brush burn abrasions" which are "scraping[s] of the superficial skin over an area that indicates a dragging type of force." Jumbelic found many additional bruises on the chest, abdomen, back, arms, hands, and legs. Casillas had a blood-alcohol level of approximately .300 and a urine alcohol level of .390; Jumbelic agreed that this meant that Casillas was "very drunk" at the time of her death.

Jumbelic explained that some of Casillas' bruises "impl[y] that something long and thin has been pressed against the [body]" but noted that she could not say to a reasonable degree of medical certainty that they were caused by such an object. Jumbelic testified that the cause of Casillas' death was "cranial cerebral injuries which means injury to the skull and brain due to blunt trauma." She could not say that any one specific head injury caused Casillas' death; she was taking all the injuries together as the cause of death. She could not say to a reasonable degree of medical certainty that the crushing injury on the right side of the head did not cause Casillas' death. While all of Casillas' injuries were inflicted at approximately the same time, the massive crushing injury could obscure other contemporary injuries.

Jumbelic testified that the large crushing injury could have been caused by a car tire, but explained that additional crushing injuries, the pattern injuries, and the facial injuries were not entirely consistent with a car running over Casillas. According to Jumbelic, Casillas was alive at the time the major crushing injury occurred.

Efran Cantu testified that he went with John Galvin and the defendant in the defendant's Oldsmobile to a bar at approximately 7:30 p.m. on March 26. The stains shown in the State's pictures of the front seat of the defendant's car were not there when the three were driving around together. The defendant left Cantu and Galvin and entered the bar. After approximately 10 minutes, the defendant returned to the car with $10. Galvin and the defendant then purchased liquor, and Cantu saw the defendant drink although he did not appear to be drunk. Cantu and the defendant went to a total of three bars together. They arrived at the third bar at approximately midnight, and Cantu saw the defendant "talking to some lady." When Cantu asked the defendant for a ride home, the defendant told him "he was going to go do something" and left the bar with the lady.

Galvin testified that he lived directly across the street from the defendant. He went with the defendant and Cantu in the defendant's car on March 26. The defendant went into a bar to sell a ring; they used the money to buy gasoline and whiskey and orange juice. Galvin and the defendant drank the whiskey and juice from glasses while driving and while waiting for Galvin's girlfriend. The defendant did not appear to be drunk.

Galvin was pulling his car into his garage at approximately 1 a.m. when he saw the defendant walking toward him from the defendant's driveway. The defendant asked Galvin to follow him in his car and told Galvin that he was in trouble. Galvin noticed that the defendant had blood on his pants, hands, jacket, and lip, and smelled like vomit. Galvin followed the defendant but could not keep up with him because the defendant "was driving too fast." During the trip, Galvin blinked his bright lights at the defendant to make the defendant stop on two occasions. The defendant told Galvin that he was going to drop off his car and asked Galvin to meet him a few blocks away in Cicero. Galvin drove to the meeting place, met the defendant, and began to drive home. The defendant did not appear to be drunk and ran to meet Galvin. On the way home, the defendant only told Galvin that he was in trouble and asked to be let out of the car about one quarter of a block from his home. Galvin testified that the defendant "was out of it," but explained that he meant the defendant was gazing out the window and not talking. Galvin dropped the defendant off and went home.

The defendant made a signed court-reporter's statement to Assistant State's Attorney Bartolomenti. In that statement the defendant said the following: He was out with Cantu and Galvin when he sold a ring for $10 to Alvarez and Casillas, whom he also knew under the name Susie. He bought liquor with the money. After Galvin left, the defendant went to several bars, and at approximately 11:30 p.m. he went to the same bar where he sold the ring. He spoke with Casillas at the bar, and she asked him to help her find Alvarez because they had a fight. At approximately midnight, he left the bar with Casillas and went to another bar. Alvarez was not at the second bar, and they left together and drove around for awhile. The defendant drove behind station WVON and parked the car. He stated that Casillas "started putting her hand on my leg and started feeling up on me," and that he told her to stop because he thought of his fiancee. Casillas started removing her pants by pushing them down over one shoe; she repeatedly told the defendant to take his pants off, and "started playing around, slapping [him]." The defendant told Casillas to stop, but

Casillas slapped him again and then he slapped her. A fight broke out and he began hitting Casillas "real hard" and "punching her about three or four times in the face in the mouth area." The redness on his right hand knuckles was from punching Casillas. During the fight, he grabbed Casillas by placing both hands around her neck and then shaking her. Casillas was bleeding from her mouth and nose, and had a large amount of blood in her mouth. The defendant noticed blood on his hands, jacket and car; Casillas seemed dizzy and "drowsy, like she was out of it."

The defendant opened the passenger door and pushed Casillas out of the car, but she crawled back in before he could close the door. She "was still bleeding, but she had come to attack [him] again." He pushed her out of the car again and shut the door; her pants stuck in the door. The defendant then exited from the passenger door, and Casillas, who was lying on the ground by the door, started grabbing his legs. He pushed her away and kicked her "hard" in the face "seven to ten times." He picked up her hand and dragged her approximately eight feet away from the car. She was not moving her body from her location, and "was lying on the ground, just moaning, moving her arms and legs." The defendant returned to his car, and "drove forward to get [the] car out." Because of the debris and garbage, he had to turn the car, reverse, and go forward in approximately "a four-point turn" to leave. When he first reversed, he "hit more debris behind [him at the] back bumper." He then drove home, asked Galvin to follow him and left his car in Cicero.

The defendant first contends that the evidence is insufficient to establish his guilt of first degree murder; he asks this court to reduce his conviction to involuntary manslaughter. The defendant was charged with first degree murder under three sections of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)), and thus could have been found guilty of murder if he alternatively had an intent to kill or do great bodily harm to Casillas (section 9—1(a)(1)), knew that his acts created a strong probability of death or great bodily harm to Casillas (section 9—1(a)(2)), or if Casillas was killed while the defendant was attempting or committing a forcible felony (section 9—1(a)(3)).

■ It would serve no purpose to discuss the many cases cited by the defendant and the State on the question of whether the defendant was proved guilty of first degree murder. Suffice it to say, first, that a killing in the commission of a felony is first degree murder. The defendant does not contest his conviction of aggravated criminal sexual assault, a forcible felony. Consequently, the defendant impliedly concedes that the evidence establishes that he was guilty of a killing

in the commission of a forcible felony. Moreover, even in the absence of such a concession, we find that the evidence supports it. A fact finder was not required to accept everything in the defendant's statement. After considering all the circumstantial evidence with parts of the defendant's statement, a fact finder could reasonably conclude that he assaulted Casillas with the intent to have sexual relations with her. Second, the evidence is more than sufficient to establish that the defendant brutally beat the deceased, ran over her and left her to die. Even in the absence of any aggravated sexual assault, the evidence shows that the defendant intentionally committed acts which he knew created a strong probability of death or great bodily harm to Casillas. The location of the scene of the killing, the extensive and brutal nature of Casillas' injuries, the lies the defendant told the police, including the calculated fabrication of a robbery, the use of Galvin to get rid of the car and the defendant's own statement add up to an overwhelming case establishing his guilt of first degree murder.

The defendant next contends that the trial judge committed reversible error by restricting his cross-examination of Officer Elliott. Elliott testified that he spoke to the defendant for 30 to 45 minutes beginning at 1 p.m. on March 27 and then went to the defendant's house, where he retrieved a soaking wet black leather jacket. Elliott was present when Assistant State's Attorney Bartolomenti interviewed the defendant at 3:30 p.m. and 7 p.m.

On cross-examination a defense attorney requested a side-bar during which the following occurred:

"DEFENDANT'S ATTORNEY: Judge, at this time I'd like to *** ask Detective Elliott questions about the substance of the oral conversations that he had with Mr. Ferns prior to Mr. Bartolomenti getting there. ***

STATE'S ATTORNEY: We'd object. It's hearsay.
* * *

DEFENSE ATTORNEY: It's clearly admissions, Judge.
* * *

JUDGE: Sustain the objection.

DEFENSE ATTORNEY: Nothing further on cross."

■ We first observe that the defendant has not properly preserved this question for review. The defendant did not make an offer of proof after the line of questioning was denied, and it is not possible to tell what information the defense was hoping to obtain. The purpose of an offer of proof is to inform the trial court and opposing counsel of the nature and substance of the evidence to be introduced and to "preserv[e] that evidence for appellate review." (*People v.*

*Sanchez* (1989), 131 Ill. 2d 417, 425, 546 N.E.2d 574, 579; see also *People v. Robinson* (1977), 56 Ill. App. 3d 832, 371 N.E.2d 1170.) Second, we do not see how the defendant was prejudiced if, as his attorney told the court, his statements were "admissions." We conclude that no error has been shown in the restriction of the cross-examination of Officer Elliott.

The defendant cites *In re W.D.* (1990), 194 Ill. App. 3d 686, 551 N.E.2d 357, and *People v. Lettrich* (1952), 413 Ill. 172, 108 N.E.2d 488. Neither supports the defendant's argument.

*In re W.D.* involved a refusal by the judge to permit a defendant from eliciting all of the defendant's conversation, part of which the State brought out on direct examination. That case would be in point if the State in the case before us had brought out part of the previous conversations the defendant had had with Officer Elliott. The State did not bring out the previous conversations. In *Lettrich*, the defendant, who had been sentenced to death, contended that his uncorroborated confession was coerced by incessant questioning and threats by one police officer in particular. The defendant had repeatedly denied any involvement in the crime. The officer named by the defendant told the defendant he would have to submit to a polygraph examination and asked the defendant a series of questions. That officer was asked on cross-examination "to state all the questions asked of defendant while the polygraph machine was being used." (*Lettrich*, 413 Ill. at 177.) The officer said he could not do that without examining his notes which would take 15 minutes. The trial judge refused to recess the trial for 15 minutes. The supreme court held that the judge's refusal to permit the witness to take the 15 minutes to review his records was error. *Lettrich* has no application to this case.

The defendant next contends that the judge erred by refusing to excise certain language from the defendant's statement. The heading of the statement which had been received in evidence was as follows: "RE INVESTIGATION (FATAL BEATING OF RUTH CASILLAS A/K/A SUSIE CASILLAS)." The State's Attorney read the statement to the jury but not the heading. The defendant's attorney asked that the heading be removed, but the judge denied the request, stating, "He signed each and every page." We are not convinced that any error occurred.

■ As noted, the prosecutor did not read the heading to the jury. In addition, the record does not establish that the statement went to the jury. When discussing the defendant's motion to strike the caption, the judge pointed out "in advance" that not everything that is admitted in evidence goes to the jury. Later, when discussing what ex-

hibits would be permitted to go to the jury, the judge allowed some pictures to go to the jury, but not all. No reference was made to the statement. The responsibility on appeal for showing that error occurred is on the defendant, and he has not shown it. (*People v. Edwards* (1978), 74 Ill. 2d 1, 383 N.E.2d 944.) In addition, we find nothing prejudicial in the wording of the caption. Contrary to the defendant's argument, it was an accurate description of the investigation.

The defendant's last claim of error concerns three parts of the State's closing argument.

During the defendant's closing argument, his attorney contended that Casillas was killed by a car and not a blunt instrument. He said:

"They love to throw the word hammer. Did you see a hammer? Anybody got a hammer, a crow bar or a piece of wood or anything with blood or hair or anything on it? No. Nothing existed from this.

\* \* \*

Well, the truth is there is no instrument. \*\*\* Mark Ferns didn't have an instrument. No question."

In the State's rebuttal closing argument, the following occurred:

"STATE'S ATTORNEY: Ladies and gentlemen, you know the instrument that he is using, because it is in a car. You know that he had plenty of time to stuff that wrench. Counsel makes all this big point about where is the lug wrench. Why don't we ask Mark Ferns where the lug wrench is. It's where he dumped it.

DEFENSE ATTORNEY: Objection.

JUDGE: Sustained.

STATE'S ATTORNEY: Did he dump it in Cicero where he left his car, or did he dump it in the alley when he is on his way to his house?

DEFENSE ATTORNEY: Objection.

JUDGE: Sustained."

The defendant contends that the State's argument amounted to an impermissible reference to the defendant's failure to testify.

In *People v. Moore* (1991), 215 Ill. App. 3d 836, 576 N.E.2d 900, the defendant did not testify and the prosecutor asked in closing argument: "Where are the guns? Well, I'll tell you, I know one guy who knows where they are, and he is sitting over here in this chair." (*Moore*, 215 Ill. App. 3d at 842.) The appellate court said that these comments improperly called attention to the defendant's failure to testify but held that they were not reversible error because the

defendant had invited them. The defense had argued: "Did they find food stamps, did they find guns? No." *Moore*, 215 Ill. App. 3d at 842.

■ As in *Moore*, the prosecutor's remarks in the case before us were invited. Moreover, the judge's immediate sustaining of the objection reduced any prejudicial effect (see *People v. Campbell* (1990), 199 Ill. App. 3d 775, 557 N.E.2d 556), as did the court's instructions that closing arguments are not evidence. (*People v. Rowe* (1983), 115 Ill. App. 3d 322, 450 N.E.2d 804.) In addition, the judge also instructed the jury not to consider the defendant's failure to testify. Therefore, no reversible error was created by these remarks.

Finally, we hold that the prosecutor's statements could not have materially influenced the defendant's conviction when the record as a whole shows an overwhelming case for the prosecution. *People v. Scott* (1990), 194 Ill. App. 3d 634, 551 N.E.2d 288.

In another part of the closing argument the prosecutor said this:

"Now, even if you don't believe that he ran over her head, I would submit to you, he still does an act which shows that he was going to kill her.

Now, I would submit to you, we have proven that he intended to kill her. But if you are to believe that he didn't run over her, if you were to believe that was not what happened, then he still caused the acts which caused her death. And how did he do this? Well, ladies and gentlemen, he leaves a severely beaten woman, who is impaired and obviously severely drunk, who can't fend for herself, who probably drank all of his liquor that night, lying on the dirt road, even if she is conscious. He leaves [her there] lying on a dirt road. What does he do? He goes and gets rid of the car. And he is with these people, with his friend, with the police, with her husband. He is in a hospital and never tells anybody about it. Just leaves her out there in that condition.

After she has been beaten, she has defecated on herself, she is lying there, I would submit to you that you know those acts will cause her death or create a strong probability of death or great bodily harm. He was the one who left her there that night. Nobody else."

■ The defendant contends that the prosecutor's remarks did not accurately state Illinois law regarding what conduct constitutes first degree murder. We construe the defendant's argument to be that one may never commit murder with one's fist. That is not the law, as the cases cited by the defendant teach. (*People v. Gresham* (1979), 78 Ill. App. 3d 1003, 398 N.E.2d 398; *People v. Drumheller* (1973), 15 Ill.

App. 3d 418, 304 N.E.2d 455.) The jury heard evidence from which it could infer that the defendant inflicted blows upon Casillas with some type of instrument. Moreover, in the defendant's statement, he said that he kicked Casillas "hard" in the face "seven to ten times." The record clearly supports the prosecutor's argument and that argument did not misstate the law.

We further note that no objection was made to the argument, nor was it assigned as error in the post-trial motion. Consequently, any error would be waived. Considering the nature of the State's case, the error could not be considered plain error.

The prosecutor also argued as follows:

"What you see in this case is counsel stretching the tarpaulin to cover every possible base in this case. He has got to cover it all the way. He is not covering the infield. He is trying to cover the outfield. He is trying to cover the whole stadium with his lies.

DEFENSE ATTORNEY: Objection.

JUDGE: Sustained. Sustained. Stricken."

■ Understandably, the State does not seek to justify this argument. Instead, it maintains that the defendant was not prejudiced because of the judge's immediate ruling sustaining the objection and striking the State's comment. The State also maintains that any error was harmless beyond a reasonable doubt in view of the overwhelming nature of the State's evidence. Although the comment was error, we agree with the State. In the principal case cited by the defendant, *People v. Emerson* (1983), 97 Ill. 2d 487, 455 N.E.2d 41, the supreme court reversed a murder conviction and death sentence. The supreme court held that several of the State's arguments were improper as was the introduction of prior consistent statements made by the principal witness for the State. The supreme court pointed out that the State's case depended solely upon the credibility of the one witness for the State and the credibility of the defendant. We repeat that this case, unlike *Emerson*, was an overwhelming one for the prosecution, and the single comment by the prosecutor to which an objection was sustained was the only error.

For these reasons, the judgment of the circuit court is affirmed.

Judgment affirmed.

McNAMARA, P.J., and RAKOWSKI, J., concur.